Filed 2/26/16  P. v. Murphy CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C076844 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F08127) |
| v. | |
| CARL FREDERICK MURPHY, | |
| Defendant and Appellant. | |

The trial court instructed the jury on felony murder, but although defendant Carl Frederick Murphy was charged with a felony-murder special circumstance, the court did not instruct the jury on the special circumstance.  The jury found defendant guilty of first degree murder and found the felony-murder special-circumstance enhancement to be true.  The Attorney General concedes instructional error but contends it was harmless beyond a reasonable doubt.  We agree and affirm the judgment.

**FACTS**

Defendant argues on appeal, as he did throughout the trial, that the prosecution's case rested on the testimony of Naquinne Andrews, a liar and perjurer who was granted

1

immunity despite the fact he gave eight different versions of the facts, including a perjured account at the preliminary hearing. It is true the jury became well acquainted with Andrews's lack of credibility. Nevertheless, defendant does not challenge the sufficiency of the evidence on appeal. Consequently, we need not explore the nuances of each version of the facts Andrews recounted during the investigation, preliminary hearing, and trial. Suffice it to say, his story changed with each telling.

The version Andrews gave at trial provides a sufficient factual context for our discussion of the instructional error. Andrews and defendant are both parolees, and they both attended the same parolee reentry program. Defendant has tattoos on his face. On October 22, 2012, defendant called Andrews to ask him if he had three pounds of marijuana, and defendant told Andrews he had $5,000. Andrews was living with his half brother at the time, and Andrews's girlfriend had been living with them for about a week. She had not seen large amounts of marijuana in the apartment. During several phone calls, defendant and Andrews agreed to meet.

Andrews drove his girlfriend's car to the meet-up. There were two pounds of marijuana in an open duffel bag in the back seat and another bag of marijuana in a plastic bag on the floor by his brother, who was riding in the front seat as a passenger. As they arrived at their destination but before they had parked, defendant and another man jumped into the back seat of the car. Defendant pulled out a gun and Andrews's brother tried to disarm him. The other man grabbed the duffel bag and ran. Defendant fired four or five shots and then jumped out of the car and ran in the direction of his partner.

Andrews was not sure if his brother was still alive. He panicked and drove to their apartment, waking up his girlfriend from a nap. She drove them to the hospital, where Andrews's brother died. Andrews gave his first fabricated account of what had happened when interviewed by the police.

The defense was factual innocence. Defense counsel argued that Andrews had set up a drug deal to rob his own brother. He insisted that Andrews had accused defendant, a

2

random parolee he had met in a rehabilitation program, because defendant was a black man with tattoos on his face.

In rebuttal, the prosecutor pointed to evidence that corroborated Andrews's final story. He emphasized the cell phone records. On the night of the shooting Andrews told the investigators they could find the shooter by locating a cell phone with the number (916) 912-0297 (0297). Defendant, Andrews explained, had called him from this number to arrange the sale. An expert on cell phone records and cell tower information testified that he infers who is using the cell phone from the contents of the text messages that are sent.

Although the cell phone was not registered in defendant's name, his parole officer testified he used it to call him on three occasions before the shooting. The records showed numerous calls and text messages to Andrews's phone on the day of the shooting. Cell phone 0297 was deactivated later the same day.

The contents of the text messages were also incriminating. A text sent three days before the shooting from 0297 stated, "[a]m out here trying to find something to hit." The expert translated the text to mean the person using 0297 was trying to get some money together and the parties then discussed what kind of drugs to sell. The person using 0297 suggested selling "weed" or "dope crystal," which the expert translated to mean marijuana or methamphetamine.

On October 22 the person using 0297 was located about 0.6 mile from the shooting. The user wrote, "Bro I got a lick for the 3 pounds do you have a hammer need it bad." The expert explained to the jury that "lick" meant robbery, "3 pounds" meant the amount of drugs, and "hammer" meant a gun. The records showed numerous calls between 0297 and Andrews's phone on the same day. Defendant's girlfriend, Karen Brazil, texted 0297 and referred to the recipient as "Kaderion," which is how she referred to defendant in a monitored phone call following his arrest. In response to her question,

3

"Ok so when ima see u," the person using 0297 responded, "When I take care of this lil biz am handleing.  Trying put something in motion."

The records from the parolee reentry program also corroborated Andrews's testimony.  The records demonstrate the two parolees were in attendance at the program on 14 different days in the spring of 2012.

Andrews testified that defendant selected the meet-up location because it was close to defendant's grandmother's house.

There was no evidence, other than Andrews's testimony, that defendant was known by the nickname "Tay."

## DISCUSSION

Defendant urges us to reverse his sentence of life without the possibility of parole because the trial court's failure to instruct on the special circumstance allegation violated his federal constitutional rights to a jury trial and due process.  He contends the error constitutes structural error requiring an automatic reversal without consideration of whether the error was harmless.  The California Supreme Court rejected this argument in a similar case.

In *People v. Mil* (2012) 53 Cal.4th 400 (*Mil*), the defendant argued that a trial court's failure to instruct on more than one essential element of the charged offense constitutes structural error and thus cannot be cured by a finding the omission is harmless.  The court recognized that most constitutional errors can be harmless.  As a consequence, unless the error is a defect that affects the very " ' "framework within which the trial proceeds" ' " (*id*. at p. 410), where an instruction omits multiple elements of the offense or special circumstance allegation "but the elements were uncontested and supported by overwhelming evidence, it would not necessarily follow that the trial was fundamentally unfair or an unreliable vehicle for determining guilt or innocence" (*id*. at p. 411).

4

Quoting *People v. Cummings* (1993) 4 Cal.4th 1233 (*Cummings*), the Supreme Court acknowledged that the omission of " 'substantially all of the elements' " of a charged offense is reversible per se (*Mil*, *supra*, 54 Cal.4th at p. 413). The court held, however, that "[t]he critical inquiry . . . is not the *number* of omitted elements but the *nature* of the issues removed from the jury's consideration. Where the effect of the omission can be 'quantitatively assessed' in the context of the entire record . . . , the failure to instruct on one or more elements is mere ' "trial error" ' and thus amenable to harmless error review. [Citation.]" (*Id*. at pp. 413-414.)

Like the Supreme Court in *Mil*, we do not find that the omission here is akin to the structural error found in *Cummings*. In *Cummings*, the trial court failed to instruct the jury on the elements of robbery, which was the subject of many of the charges against the defendant. Thus, the court's failure to instruct rendered the trial unfair and prevented the trial from "reliably serving its function as the means for determining defendant's guilt or innocence." (*Mil*, *supra*, 53 Cal.4th at p. 416.)

Here the jury was instructed on felony murder in relevant part as follows: "The defendant is charged with murder, under a theory of felony murder.

"To prove that the defendant is guilty of first degree murder under this theory, the People must prove that:

"1. The defendant committed or attempted to commit robbery in violation of Penal Code section 211.

"2. The defendant intended to commit robbery;

"AND

"3. While committing or attempting to commit robbery, the defendant caused the death of another person.

"A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent. [¶] . . . [¶]

5

"The defendant must have intended to commit the felony of [*sic*] before or at the time that he caused the death." (CALCRIM No. 540A.)

The elements of the robbery-felony-murder special circumstance are set forth in CALCRIM No. 730, but the trial court failed to give the standardized instruction. The elements are nearly identical to the elements of first degree felony murder:

"1. The defendant committed robbery;

"2. The defendant intended to commit robbery;

"AND

"3. The defendant did an act that caused the death of another person." (*Ibid*.)

There is no requirement that the perpetrator entertain the intent to kill for either the offense of felony murder or the robbery-felony-murder special circumstance. (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 81.) Yet to satisfy due process, the special circumstance must be distinct from felony murder. "[T]he felony-murder offense is established merely upon a showing that the defendant killed during the commission or attempted commission of the felony, whereas the felony-murder special circumstance requires an additional showing that the intent to commit the felony was independent of the killing." (*Id*. at p. 80.)

The jury was required to find, therefore, each of the elements of a special-circumstance felony murder pursuant to the instructions on felony murder other than the final element—the independent felonious intent. Under these circumstances, we conclude, as the Supreme Court did in *Mil*, that the omission neither wholly withdrew substantially all of the elements of the special circumstance nor did it so vitiate all of the jury's findings as to render the trial fundamentally unfair and effectively deny defendant a jury trial altogether. As a consequence, the omission does not constitute structural error and does not require reversal per se. Because the error is amenable to harmless error analysis, we must determine "whether it appears beyond a reasonable doubt that the error did not contribute to the jury's verdict." (*Mil*, *supra*, 53 Cal.4th at p. 417.)

6

The Attorney General maintains the instructional error is harmless because the jury's findings on first degree felony murder established the elements of the felony-murder special circumstance. The Attorney General's argument is premised on her assertion that the elements of each are identical. Defendant points out there must be a distinction between felony murder and the felony-murder special circumstance to preserve the constitutionality of the Penal Code section 190.2, subdivision (a)(17) felony-murder special circumstance. (*People v. Green* (1980) 27 Cal.3d 1, 59-61 (disapproved on other grounds in *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3.) That distinction, as explained above, is an independent intent to commit the felony that is not merely incidental to the murder.

It is true that in finding defendant guilty of first degree felony murder it necessarily found defendant committed a robbery, and he intended to commit a robbery at or before the time he caused the death of the victim during the commission of the robbery. Those findings come close to finding each of the requisite elements of the special circumstance. Yet defendant insists these findings are not sufficient because they do not include a finding that he entertained an independent intent to commit robbery and not to merely further the murder. *People v. Prieto* (2003) 30 Cal.4th 226 (*Prieto*) and *People v. Harden* (2003) 110 Cal.App.4th 848 (*Harden*) provide excellent templates for a harmless error analysis where, as here, there was no evidence that reasonably or rationally suggests defendant committed the robbery to advance the murder.

In *Prieto*, *supra*, 30 Cal.4th 226, the Supreme Court found the instructional error on the felony-murder special circumstance harmless error and explained its rationale as follows: "In this case, 'there was no evidence that reasonably or rationally suggests that' defendant committed the robberies, kidnappings, or rapes in order to carry out or advance the murder. [Citation.] . . . No evidence suggests that defendant or his cohorts intended to murder [the victim] at the time they formed the intent to rob and kidnap the women or that the robberies and kidnapping were incidental to the murder. Rather, the evidence

7

strongly suggests that defendant committed the murder in order to advance the robberies and kidnappings or 'to facilitate the escape therefrom or to avoid detection.' . . . At best, this evidence suggests that defendant developed the intent to kill [the victim] and the intent to rape her at the same time. . . . Thus, the evidence shows that defendant committed the murder to advance the rape or to facilitate his escape or to avoid detection—and did not commit the rape to further the murder." (*Id*. at p. 257.)

Similarly, in *Harden*, *supra*, 110 Cal.App.4th 848, there was no evidence that reasonably or rationally shows the defendant committed a robbery or burglary to carry out a murder. The court wrote: "No evidence suggests Harden intended to murder Alfred before or at the time she formed the intent to rob Alfred and burglarize the Polchows' home or that the robbery and burglary were incidental to the murder. [Citation.] Rather, the evidence overwhelmingly suggests Harden committed the murder to advance the robbery and burglary." (*Id*. at p. 866.) Again, the court found the instructional error on the special circumstance harmless beyond a reasonable doubt.

The same is true here. There is no evidence and the parties did not argue that defendant robbed Andrews and his brother to facilitate the murder. In fact, the evidence was overwhelming that defendant planned the robbery and not a murder. Andrews testified he arranged a sale of marijuana with defendant. Defendant's text messages, however, make clear that defendant intended to steal the marijuana, not to buy it. And he intended to take it by force or fear. His text message read, "Bro I got a lick for the 3 pounds do you have a hammer need it bad." As pointed out, *ante*, lick is a slang term for robbery and hammer means gun. Moreover, his behavior was consistent with an intent to commit robbery. As soon as Andrews pulled up, defendant and his partner jumped into the car, and his partner grabbed the duffel bag of marijuana and fled. Defendant did not shoot the victim until after the victim lunged at him. We agree with the Attorney General that this sequence of events indicates defendant only formed the intent to kill after the victim attempted to disrupt the robbery.

There is no evidence defendant bore the victim any ill will or had any motive to kill him in advance of the robbery. All of the evidence suggests a robbery gone awry. In the absence of any evidence upon which a jury could reasonably and rationally conclude he intended the robbery only as a means to murder the victim, the court's instructional omission was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is affirmed.


        RAYE        , P. J.


We concur:


    NICHOLSON    , J.


    RENNER    , J.